BEFORE THE ADMINISTRATOR
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

| | |
|---|---|
| IN THE MATTER OF: )<br>WISCONSIN POWER AND LIGHT )<br>COLUMBIA GENERATING STATION )<br> )<br> )<br> )<br>Permit No. 111003090-P20 )<br>Proposed by the Wisconsin Department )<br>Natural Resources ) | ORDER RESPONDING TO<br>PETITIONER'S REQUEST<br>THAT THE ADMINISTRATOR<br>OBJECT TO ISSUANCE OF<br>STATE OPERATING PERMIT<br><br>Petition Number V-2008-1 |

## ORDER GRANTING IN PART AND DENYING IN PART
## PETITION FOR OBJECTION TO PERMIT

On September 2, 2008, pursuant to its authority under the State of Wisconsin implementing statute, Wis. Stat. Ann. 285.62-285.64, and regulations, Wis. Admin. Code NR 407, title V of the Clean Air Act (Act or CAA), 42 U.S.C. §§ 7661-7661f, and the U.S. Environmental Protection Agency's implementing regulations at 40 C.F.R. Part 70 (Part 70), the Wisconsin Department of Natural Resources (WDNR) issued a title V renewal operating permit to Wisconsin Power and Light (WPL) (now Alliant Energy) Columbia Generating Station (Columbia), #111003090-P20 (P20). The Columbia plant primarily consists of two 527 megawatt pulverized coal fired boiler generators, and coal handling equipment, such as conveyors and storage piles.

On September 3, 2008, EPA received a petition from David Bender of the Garvey McNeil & McGillivray, SC, Law Offices, on behalf of the Sierra Club (Petitioner), requesting, pursuant to section 505(b)(2) of the Act and 40 C.F.R. § 70.8(d), that EPA object to issuance of the Columbia title V permit. The Petitioner alleges that the permit is not in compliance with the requirements of the Act. Specifically, the Petitioner alleges that (1) the Columbia permit omits applicable Prevention of Significant Deterioration (PSD) requirements based on an erroneous legal interpretation by WDNR; (2) WDNR failed to respond to substantive comments from Petitioner regarding alleged factual errors in WDNR's PSD applicability determination; (3) the permit does not include a compliance schedule addressing opacity/visible emissions (VE) violations; and (4) the permit omits applicable requirements related to hazardous air pollutant emissions, including the requirement to submit a case-by-case maximum achievable control technology (MACT) "MACT Hammer" application.

EPA has reviewed these allegations pursuant to the standard set forth in section 505(b)(2) of the Act, which requires the Administrator to issue an objection if the Petitioner demonstrates to the Administrator that the permit is not in compliance with the applicable requirements of the Act. *See also* 40 C.F.R. § 70.8(d); *New York Public Interest Research Group v. Whitman*, 321 F.3d 316, 333 n.11 (2nd Cir. 2002).

1

Based on a review of the available information, including the petition, the permit record, and relevant statutory and regulatory authorities and guidance, I grant the Petitioner's request in part and deny it in part, for the reasons set forth in this Order.

## STATUTORY AND REGULATORY FRAMEWORK

Section 502(d)(1) of the Act requires each state to develop and submit to EPA an operating permit program to meet the requirements of title V. EPA granted final full approval of the Wisconsin title V operating permit program effective November 30, 2001. 66 Fed. Reg. 62951 (December 4, 2001).

All major stationary sources of air pollution and certain other sources are required to apply for title V operating permits that include emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the CAA, including the requirements of the applicable State Implementation Plan (SIP). *See* CAA §§ 502(a) and 504(a), 42 U.S.C. §§ 7661a(a) and 7661c(a). The title V operating permit program does not generally impose new substantive air quality control requirements (referred to as "applicable requirements"), but does require permits to contain monitoring, recordkeeping, reporting, and other requirements to assure compliance by sources with existing applicable emission control requirements. 57 Fed. Reg. 32250, 32251 (July 21, 1992) (EPA final action promulgating Part 70 rule). One purpose of the title V program is to "enable the source, states, EPA, and the public to better understand the requirements to which the source is subject, and whether the source is meeting those requirements." *Id.* Thus, the title V operating permits program is a vehicle for ensuring that existing air quality control requirements are appropriately applied to facility emission units and that compliance with these requirements is assured.

For a major modification of a major stationary source, applicable requirements include the requirement to obtain a preconstruction permit that complies with applicable new source review requirements (e.g., PSD). Part C of the CAA establishes the PSD program, the preconstruction review program that applies to areas of the country, such as Pardeeville, Wisconsin, that are designated as attainment or unclassifiable for National Ambient Air Quality Standards (NAAQS). CAA §§ 160-169, 42 U.S.C. §§ 7470-7479. New Source Review, or "NSR," is the term used to describe both the PSD program and the nonattainment NSR program (applicable to areas that are designated as nonattainment with the NAAQS). In attainment areas, a major stationary source may not begin construction or undertake certain modifications without first obtaining a PSD permit. CAA § 165(a)(1), 42 U.S.C. § 7475(a)(1). The requirements established in a preconstruction PSD or nonattainment NSR permit become applicable requirements that must be included in a source's title V permit.

Under section 505(a) of the Act, 42 U.S.C. § 7661d(a), and the relevant implementing regulations (40 C.F.R. § 70.8(a)), states are required to submit each proposed title V operating permit to EPA for review. Upon receipt of a proposed permit, EPA has 45 days to object to final issuance of the permit if it is determined not to be in compliance with applicable requirements or the requirements under title V. 40 C.F.R. § 70.8(c). If EPA does not object to a permit on its own initiative, section 505(b)(2) of the Act provides that any person may petition the Administrator, within 60 days of expiration of EPA's 45-day review period, to object to the

permit. 42 U.S.C. § 7661d(b)(2), *see also* 40 C.F.R. § 70.8(d). The petition must "be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period)." Section 505(b)(2) of the Act, 42 U.S.C. § 7661d(b)(2). In response to such a petition, the CAA requires the Administrator to issue an objection if a petitioner demonstrates that a permit is not in compliance with the requirements of the CAA. 42 U.S.C. § 7661d(b)(2). *See also* 40 C.F.R. § 70.8(c)(1); *New York Public Interest Research Group (NYPIRG) v. Whitman*, 321 F.3d 316, 333 n.11 (2nd Cir. 2003). Under section 505(b)(2), the burden is on the petitioner to make the required demonstration to EPA. *Sierra Club v. Johnson*, 541 F.3d 1257, 1266-1267 (11th Cir. 2008); *Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 677-678 (7th Cir. 2008); *Sierra Club v. EPA*, 557 F.3d 401, 406 (6th Cir. 2009) (discussing the burden of proof in title V petitions); *see also NYPIRG*, 321 F.3d at 333 n.11. If, in responding to a petition, EPA objects to a permit that has already been issued, EPA or the permitting authority will modify, terminate, or revoke and reissue the permit consistent with the procedures set forth in 40 C.F.R. §§ 70.7(g)(4) and (5)(i) – (ii) and 70.8(d).

Where a petitioner's request that the Administrator object to the issuance of a title V permit is based in whole, or in part, on a permitting authority's alleged failure to comply with the requirements of its approved PSD program (as with other allegations of inconsistency with the Act) the burden is on the petitioners to demonstrate that the permitting decision was not in compliance with the requirements of the Act, including the requirements of the SIP. Such requirements, as EPA has explained in describing its authority to oversee the implementation of the PSD program in states with approved programs, include the requirements that the permitting authority (1) follow the required procedures in the SIP; (2) make PSD determinations on reasonable grounds properly supported on the record; and (3) describe the determinations in enforceable terms. *See, e.g.,* 68 Fed. Reg. 9,892, 9,894-9,895 (March 3, 2003); 63 Fed. Reg. 13,795, 13,796-13,797 (March 23, 1998). EPA has approved the PSD programs into the SIPs of most states, including Wisconsin. *See, e.g.,* 64 Fed. Reg. 28,745 (May 27, 1999). In reviewing a petition to object to a title V permit raising concerns regarding a state's PSD permitting decision, EPA generally will look to see whether the petitioner has shown that the state did not comply with its SIP-approved regulations governing PSD permitting or whether the state's exercise of discretion under such regulations was unreasonable or arbitrary. *See, e.g., In re East Kentucky Power Cooperative, Inc.* (Hugh L. Spurlock Generating Station) Petition No. IV-2006-4 (Order on Petition) (August 30, 2007); *In re Pacific Coast Building Products, Inc.* (Order on Petition) (December 10, 1999); *In re Roosevelt Regional Landfill Regional Disposal Company* (Order on Petition) (May 4, 1999).

## BACKGROUND

Columbia submitted to WDNR an application to renew its title V permit on October 17, 2007. WDNR provided the public notice of the draft title V permit on April 28, 2008 and proposed the title V renewal permit on July 9, 2008. During the public comment period, WDNR received comments on the draft permit, including comments from the Petitioner. EPA did not object to the permit. WDNR issued the final permit on September 2, 2008.

October 23, 2008 was the deadline, under the statutory timeframe in section 505(b)(2) of the Act, to file a petition requesting that EPA object to the issuance of the final Columbia permit. The Petitioner submitted its petition to object to the issuance of the Columbia permit to EPA on September 3, 2008. Accordingly, EPA finds that Petitioner timely filed this petition.

## ISSUES RAISED BY THE PETITIONER

### I.        Prior PSD Applicability Determinations

The Petitioner states that every title V permit must assure compliance by the source with all applicable requirements. Petition at 2, citing section 504(a) of the CAA; 40 C.F.R. § 70.1, Wis. Stat § 285.64(1); and Wis. Admin. Code § NR 407.09(4)(b). Applicable requirements include SIP requirements, including the requirement to obtain a PSD preconstruction permit and apply the best available control technology (BACT). Petition at 2, citing 40 C.F.R. § 70.2; Wis. Stat. § 285.64(1); Wis. Admin. Code § NR 400.02(26); and *In re Monroe Electric Generating Plan, Entergy Louisiana, Inc.*, Petition No. 6-99-2 (June 11, 1999). The Petitioner further asserts that, if the facility is not in compliance with all applicable requirements at the time of permit issuance, the permit also must contain an enforceable schedule to bring the facility into compliance. Petition at 3, quoting *In the Matter of Onyx Environmental Services*, Petition No. V-2005-1 at 6-7 (February 1, 2006). The Petitioner concludes that the Administrator must object to the Columbia permit because, among other things, it omits applicable PSD requirements and a schedule of compliance to ensure compliance with applicable PSD requirements.

The Petitioner claims that PSD is an applicable requirement for the Colombia plant because, in 2006, WPL, the owners and operators of the facility, commenced construction of a project to replace the economizer, final superheater, and related components on Unit 1. According to the Petitioner, WPL estimated in its application to the Public Service Commission of Wisconsin (PSCW) that the cost of the project would be $18.9 million. Petition at 3. The Petitioner alleges that both WPL's application to the PSCW and the PSCW's response to the application identify the need to regain lost operating time as the purpose for the project. Petition at 4. The Petitioner asserts that WDNR concurred that the purpose of the project was to regain lost operating time attributable to the economizer and superheater sections of the boiler. *Id.* Based upon the WDNR analysis of the company's data, the Petitioner alleges that the permittee expects Unit 1 to regain 35.075 hours annually as a result of the project. The Petitioner asserts that, multiplied by the assumed emission rate, this would result in a 61 ton per year increase in sulfur dioxide ($SO_2$), an increase that exceeds the threshold for a "major modification." Petition at 4-5. However, the Petitioner states that WPL's calculations result in an increase of only 39 tons per year. Petition at 6, citing August 30, 2005 letter from Steve Jackson, WPL, to Steve Dunn, WDNR (Jackson letter). The Petitioner alleges that this conclusion is based on an impermissible interpretation of law "whereby a projected significant increase can be ignored and, instead, a facility can use confirmed-actual emissions to reevaluate emission increases after the project." Petition at 6. The Petitioner concludes that this is an erroneous interpretation of law, and, thus, the Administrator must object to the permit. *Id.*

4

## A. The Economizer/Superheater Project on Unit 1

The Petitioner provides a summary of the PSD program and its history, and claims that the PSD program requirements, including permitting, BACT, and emission impact analysis, are "applicable requirements" for purposes of title V for each facility that undergoes a "major modification." Petition at 6-7, citing 42 U.S.C. §§ 7475(a), 7479; Wis. Admin. Code §§ NR 405.07, 405.09, 405.11, 405.13-405.15. The Petitioner asserts that the economizer/superheater replacement was a major modification because it was a physical change which, under the correct interpretation of the law, resulted in a projected significant increase in $SO_2$ emissions, even assuming all of WDNR's factual assumptions are true. Petition at 7-8.

Consistent with EPA's implementing regulations and the Act, Wisconsin's SIP, Wis. Admin. Code NR 405.02(21)(b)(2)(i) (2006) defined "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any air contaminant subject to regulation under the act." Accordingly, for a major modification to occur there must be (1) a physical change and (2) a significant net emissions increase.

### 1. Physical Change

The Petitioner claims that the term "physical change" is very broad. According to Petitioner, Congress intended that "any physical change" trigger the PSD program, and intended the term to have an expansive meaning. Petition at 8, citing *New York v. EPA*, 443 F.3d 880, 885-87 (D.C. Cir 2006), *New York v. EPA*, 413 F.3d 3, 40-42 (D.C. cir. 2005); *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990); September 9, 1988 memorandum "Applicability of Prevention of Significant Deterioration (PSD) and New Source Performance Standards (NSPS) Requirements to the Wisconsin Electric Power Company (WEPCO) Port Washington Life Extension Project 3." The Petitioner contends that the economizer/superheater replacement project was unquestionably a "physical change" because the components are large and took many weeks and millions of dollars to replace. Petition at 8-9.

### Response

The air emissions at the Columbia plant are governed by the Wisconsin SIP-approved PSD program. The Wisconsin PSD program applicable at the time of WDNR's applicability determination and the 2006 project was approved by EPA on May 27, 1999 (64 Fed. Reg. 28745), and does not include later federal changes, "Reform," to the NSR major source regulations.

There is not a genuine dispute on the issue of whether the 2006 replacement of the economizer/superheater was a "physical change." WDNR does not suggest that WPL claimed that this project was not a physical change to the Columbia plant. Instead, WPL in effect acknowledged a physical change by seeking a regulatory exemption under Wisconsin's SIP from PSD construction permit requirements for the proposed change. The October 12, 2005 permit exemption letter from Roger Fritz, WDNR, to Steve Jackson, Alliant Energy (Fritz Letter)

5

approved WPL's request to exempt the project from permitting requirements by allowing WPL to purportedly manage its emissions to avoid a significant net emissions increase.

### 2. Emission Increase

#### a. State failed to properly apply the applicable legal test

The Petitioner further alleges that the economizer/superheater replacement would result in a significant net emission increase under the correct legal test. The Petitioner asserts that, historically, to determine if a physical change results in a "significant net emissions increase" under the Wisconsin SIP, a source's actual emissions generally were compared to its potential to emit. Petition at 9, citing to Wis. Admin. Code §§ NR 405.02(1), (24)(a)1 (1988); *Puerto Rican Cement Co., Inc. v. U.S. EPA*, 889 F.2d 292, 296 (1st Cir. 1989) (some cites omitted). However, Petitioner asserts, an electric utility steam generating unit, like the Columbia facility at issue here, has the option to compare its historic "actual" emissions to its future projected emissions, based on EPA's 1992 rulemaking known as the "WEPCO Rule." Petition at 9-10, citing Wis. Admin. Code § NR 405.02(1)(d); *U.S. v. Murphy Oil USA*, 143 F. Supp.2d 1054, 1104. The Petitioner claims that the "actual-to-projected-actual" test is a projection of future emissions. Petition at 10. Petitioner states that, under the WEPCO Rule and EPA's December 31, 2002 rulemaking (67 Fed. Reg. 80186) in which EPA expanded the option to use the WEPCO Rule test to determine applicability for all types of facilities, an emission increase projection is based on the number of hours the unit is projected to operate in the future, multiplied by the emission rate. Petition at 10. The Petitioner suggests in a footnote that WPL underestimated the emissions from the project. Petition at 11, n. 3. The Petitioner states, however, that WPL's own figures show that the hourly emissions rate for Unit 1, which is based on the emission unit's operational capabilities following the change, is 3481.5 lb/hr (4985 MMBtu/hour*0.6984 lb $SO_2$/MMBtu). Petition at 11, citing Jackson letter, Attachment 1. The Petitioner calculates that, multiplied by the projected level of utilization attributable to the physical change, as required by the actual-to-projected-actual test, or 35.075 hours/year[1] in this case, the resulting projected increase in $SO_2$ is greater than 61 tons per year, which is a significant net emissions increase. Petition at 11. The Petitioner claims that this method of calculating a significant increase - a projection based upon regained operation hours multiplied by the hourly emission rate - is the same calculation EPA has used in numerous cases. Petition at 11, citing *United States v. Ohio Edison Co.*, 276 F. Supp.2d 829, 869-75 (S.D. Ohio 2003); *In re Tennessee Valley Authority*, 9 E.A.D. 357, 439-52 (EAB 2000).

The Petitioner alleges that WDNR did not determine PSD applicability based on the actual-to-projected-actual test. According to Petitioner, WDNR instead accepted WPL's interpretation of the law, which allowed WPL to ignore the projected significant increase, construct, and then determine PSD applicability based on confirmed post-project emissions. *Id.* Petitioner claims that WPL stated in a footnote to its 39 ton/year emission increase projection that "[p]lant operations will be managed to ensure Future Emissions are not exceeded above Past Actual emissions plus significant threshold." Petition at 11, quoting Jackson letter, Attachment 1, n.5. Petitioner asserts that this is an incorrect interpretation of law, as it noted in its comments on the draft permit. Petition at 11.

---

[1] Petitioner claims that this number is also too low. Petition at 11, n. 4.

The Petitioner further claims that WDNR did not respond substantively to its comments. Petitioner states that WDNR refused to revisit the prior interpretation of law, stating in its Response to Comments that "Sierra Club has not provided a sufficient basis for the Department to reexamine these previous exemptions or to require prevention of significant deterioration (PSD) permitting at this time." Petition at 12, quoting WDNR's Response to Comments at 2. The Petitioner states that WDNR's response is "wrong and insufficient," and, thus, the Administrator must object. The Petitioner alleges that the WEPCO Rule did not provide that a utility opting into the actual-to-projected-actual test "could ignore a projected significant increase and avoid PSD applicability based upon a promise to use actual-to-confirmed-actual post-project emissions to show no increase," but rather that the WEPCO Rule requires that a source first project that the change will not result in a significant increase, and then keep records to prevent "under-projecting." Petition at 12, citing 57 Fed. Reg. 32314, 32325 (July 21, 1992). The Petitioner claims that EPA expressly stated that the intent of the "backstop" recordkeeping and reporting provision was to *confirm* the utility's initial projections rather than *annually revisiting* the issue of NSR applicability." *Id.* at 12. (Emphasis in original.) Petitioner further asserts that an "actual-to-confirmed-actual" test has been rejected by EPA and every court to consider it. Petition at 13, citing *U.S. v. SIGECO*, 2002 WL 1629817 (S.D. Ind. 2002); United States v. Cinergy Corp., 2005 U.S. Dist. LEXIS 28755; *United States v. Ohio Edison Co.*, 276 F. Supp.2d 829 (S.D. Ohio 2003); briefs and other documents filed by the United States in *U.S. v. Cinergy Corp.*, and *U.S. v. Duke Energy Corp.* The Petitioner concludes that WDNR's acceptance of WPL's "wait and see approach" for determining PSD applicability is unlawful, and that the Administrator must object to the permit. Petition at 14.

The Petitioner claims that WDNR's analysis is especially concerning because there is no explanation for WPL's projection of a 39 ton per year increase in $SO_2$. The Petitioner states that, although WPL asserts that it will "manage" the Columbia facility's operations to prevent an increase of $SO_2$ greater than 39 tons per year, WPL has not indicated that it will manage other pollutants, such as carbon monoxide, nitrogen oxides and particulate matter, for which WPL predicts emission increases. Petition at 14. The Petitioner claims that there are no post-combustion pollution controls for $SO_2$ at the Columbia facility Unit 1 and emissions for all pollutants are directly correlated to total hours of operation. Petition at 14, citing Jackson letter, Attachment 1. The Petitioner states that WPL's assertion that it will attempt to "manage" emissions post-project to limit increases in $SO_2$ conflicts with its projection of increases for the other pollutants, and concludes that this incongruity reinforces why EPA should not countenance WDNR's and WPL's reliance on the "actual-to-confirmed-actual" for $SO_2$. Petition at 14.

**Response**

EPA grants the petition on this issue and finds that WDNR misapplied the regulatory standard for determining whether the replacement of the economizer/superheater in 2006 resulted in a significant net emission increase. As discussed below, we further conclude the WDNR improperly allowed the facility to rely on a post-change emission level that was not consistent with "normal source operations" and that WDNR improperly allowed the source to rely upon certain exceptions noted below.

WDNR based its decision that the PSD requirements were not applicable to the Columbia plant on a misapplication of the regulatory standard for determining whether there was a significant emissions increase, and as a result improperly considered whether there was a significant net emissions increase. Under the applicable SIP provisions, a determination of whether a project results in a significant emissions increase is examined by comparing pre-change actual emissions[2] with a projection of post change emissions. As Petitioner does not dispute the calculation of pre-change emissions, the gravamen of Petitioner's argument is that WDNR used an improper legal standard to measure the post-project emissions from the replacement of the economizer/superheater in 2006. Petition at 2.

The then-applicable Wisconsin SIP provision for projecting actual emissions of electric utility facilities after a physical change is set forth in Wis. Admin. Code NR 405.02(1)(d)(2006). That provision states the following:

> For an electric utility steam generating unit, other than a new unit or the replacement of an existing unit, actual emissions of the unit following the physical or operational change shall equal the representative actual annual emissions of the unit, provided the source owner or operator maintains and submits to the department, on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase. A longer period, not to exceed 10 years, may be required by the department if the department determines such a period to be more representative of normal source post-change operations.

NR 405.02(1)(d)(2006).

WDNR seeks to justify its approach for assessing post-project emissions for the project in the October 12, 2005 permit exemption letter from Roger Fritz at WDNR to Steve Jackson. In this letter, WDNR stated that "as long as the facility would be operated in a way that would not result in a *significant net emissions increase*, the project would not be a major modification, and would not require a construction permit under ch. NR 405, Wis. Adm. Code." Fritz Letter at 2. WDNR further stated that "projected future emissions would be limited by the applicant for nitrogen oxides and sulfur dioxide to below the sum of past actual emissions plus the significance threshold". *Id.* at 2. Although the significance threshold for $SO_2$ was 40 tpy, and the facility in fact projected a 61 ton increase in $SO_2$ due to regained operating hours, WDNR explained that "the applicant would limit operations to keep emissions below this level for the five-year period following the project." *Id.* at 2. Based on this faulty analysis that ignored the projected post-project emissions, WDNR excluded the project from PSD.

As noted above, the applicable provision for computing post-change emissions requires

---

[2] "Actual emissions" were defined under the Wisconsin SIP, Wis. Admin. Code NR 405.02(1) (2006), as "the actual rate of emissions of a air contaminant from an emissions unit, as determined in accordance with paragraphs (a) through (d)." Wis. Admin. Code NR 405.02(1)(a) (2006) provides a method for calculating pre-project actual emissions. Under this regulation, actual emissions before a project "shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation."

that they be "representative actual annual emissions." Wis. Admin. Code NR 405.02(1)(d) (2006). Absent from WDNR's approach of permitting post-project emissions management as a way to avoid PSD, is an explanation of how providing for a period of five years in which a facility artificially limits its emissions, and monitors to stay below the significance threshold, is consistent with this requirement.

Indeed, the five years in which the facility has agreed informally to constrain it emissions and report post-change emissions data appears directed at aligning with the post project recordkeeping requirement in NR 405.02(1)(d) (2006); but this five year window does not by its terms establish a window in which, if a facility artificially constrains its emissions, it avoids NSR. Since this artificial emission limit could not be considered "representative actual annual emissions of the unit" following the physical change, WDNR used the wrong methodology for measuring post-project emission increases for an electric utility steam generating unit. Accordingly, WDNR misapplied its SIP standard by using an artificial emission limit rather than the "representative actual annual emissions of the unit" following the physical change. The use of this artificial emission standard was inconsistent with Wis. Admin. Code NR 405.02(1)(d)(2006).

WDNR's use of an improper standard for projecting actual emissions from the project change also prevented it from properly determining whether the physical change would result in significant net emission increase. Wis. Admin. Code NR 405.02(24)(a)(2006) defines a "net emissions increase" as "the amount by which the sum of the following exceeds zero: 1. Any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source. 2. Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." WDNR did not do a proper applicability determination because it misapplied the PSD standard for determining actual emissions from the proposed physical change. As a result, WDNR improperly concluded that the physical change did not result in a major modification that triggered PSD permitting requirements.

WDNR also improperly relied on certain minor source permitting exemptions to justify its permitting decision. More specifically, WDNR found two additional grounds for excluding the project in 2005 from PSD permit requirements under Wis. Adm. Code sections NR 406.04(4)(e) - Increase in hours of operation and NR 406.04(4)(h) - Other changes. Fritz Letter at 2. An "increase in hours of operation" is not considered a modification under Wis. Adm. Code NR 406.04((4)(e) (2006) if:

1. The increase is not prohibited by any permit, plan approval or special order applicable to the source.

2. The increase will not cause or exacerbate the violation of an ambient air quality standard or ambient air increment or violate an emission limit.

Further, Wis. Adm. Code NR 406.04(4)(h) (2006) provides an exemption for a "change" that meets all of the following conditions:

1. The change is not prohibited by any permit, plan approval or special order applicable to the source.

2. The change is exempt under sub. (1), or the increased emissions due to the change do not exceed the maximum theoretical emission levels specified in sub. (2) (b), (c), (cm), (d) and (f).

3. The change does not trigger a requirement under section 111 or 112 of the Act, 42 U.S.C. § 7411 or 7412.

By the terms of Wis. Adm. Code NR 406.04, these exemptions are not applicable where the project constitutes a major modification. *See* Wis. Adm. Code NR 406.04 ("This section does not provide an exemption from construction permit requirements for a source that is required to obtain a permit under ch. NR 405"). Since WDNR has failed to show that the project was not a major modification under Wis. Adm. Code NR 405 (21) (2005) these exemptions do not apply.[3] WDNR does not offer a reasoned analysis sufficient to justify its PSD permitting decision. WDNR has simply misapplied its standard for determining the applicability of its SIP-approved PSD permit requirements.

WDNR must reevaluate the physical change in light of the correct PSD standards for determining actual emissions from the physical change at an electric utility steam generating unit. The WDNR must also do a proper applicability determination based on the correct post-project emissions standard, and clearly explain its analysis in the permit record. If WDNR concludes that the physical change, in fact, resulted in a significant net emissions increase for $SO_2$, WDNR must require WPL to obtain a PSD permit for the modification and will have to make appropriate changes to the source's title V permit and the permit record.

Further, EPA finds that WDNR failed to adequately respond to significant comments concerning whether PSD was triggered by the 2006 physical change. EPA has concluded that WDNR used the incorrect standard to determine PSD applicability. WDNR must reexamine its decision in light of the correct standard under its PSD regulations as discussed above and make appropriate changes to its permit and permit record. The failure of WDNR to respond to comments may have resulted in a flaw in the permit regarding PSD requirements.

### b.  State must address factual allegations regarding underestimation of post-change actual emissions

The Petitioner alleges that, in addition to WDNR's erroneous legal interpretation of the WEPCO Rule, WDNR also ignored evidence that the Petitioner supplied in its public comments regarding the estimate of the emissions increases attributable to the economizer/superheater project. Petition at 14, citing Sierra Club comments at 14-18. Petitioner states that WPL projected and WDNR accepted future emissions based on the emission rate multiplied by the maximum heat rate and the regained hours of operation. Petition at 15, citing Jackson letter,

---

[3] While there is a PSD exemption related to an increase in hours of operation or production rate this exemption does not apply if it was caused or was enabled by an independent physical change. *See, Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 580.

Attachment 1. The Petitioner alleges that a review of data posted on EPA's Acid Rain Database from the Columbia continuous emissions monitor (CEM) for January 2003 through December 2004 shows that the average hourly heat input for that period was 5,357.7 MMBtu/hour, rather than 4,985 MMBtu/hour, as WPL had represented. Petition at 15, citing Sierra Club comments at 16. The Petitioner asserts that WDNR responded to the comment by stating that "Sierra Club has not provided a sufficient basis for the Department to reexamine these previous exemptions..." to the PSD permitting requirements. Petition at 16, quoting WDNR Response to Comments at 2. Petitioner asserts that a meaningful response to comments requires more, and that WDNR cannot refuse to look at data. Petition at 15. Further, Petitioner alleges that the exemption determination was not publicly noticed, and the public was given no opportunity to comment on it. Petition at 15-16. Petitioner asserts that WDNR's refusal during the title V permitting process to reexamine a determination it made without notice and comment would negate the opportunity for notice and comment on title V permits. Petition at 16. The Petitioner claims that, if allowed by EPA, this practice would invite WDNR to make "off-permit determinations," then refuse to reexamine them during the title V permit process. *Id.* The Petitioner concludes that EPA must object and require that WDNR provide a meaningful response to the Sierra Club's comments. The Petitioner further claims that the Administrator must object because the facts show that the CEMs data demonstrates that the average heat rate for Columbia Unit 1 is much higher than assumed by WDNR. *Id.*

The Petitioner further alleges that WPL's projected increase in hours of operation attributable to the economizer/superheater replacement project for purposes of PSD permitting was "vastly different than the number of hours WPL told the PSCW when attempting to justify the economic benefit of the modification." Petition at 16, citing Sierra Club comments at 16-17. The Petitioner states that "WPL told the PSCW that it suffered 3 tube failures in 2003 and 2 tube failures in 2004, and that the average tube failure forced outage lasted 7515 hours." Petition at 16, citing WPL's application to the PSCW at 11.[4] The Petitioner asserts that this data would suggest to the PSCW that the project would allow the unit to regain 188.75 hours annually, rather than the 30.075 reported to WDNR. Petition at 16. Petitioner further states that publicly available information from the Generation Availability Data System also indicates that WPL's 30.075 hours/year representation omitted an outage in May 2004. Petition at 16, citing Sierra Club comments at 17.

The Petitioner claims that WDNR's response to these comments was to say that WDNR "did not have 'a sufficient basis' to reexamine its prior exemption determination." Petition at 16. The Petitioner concludes that WDNR is required to provide a meaningful response to these comments. Petition at 16-17, citing *In re Midwest Generation, LLC, Waukegan Generation Station*, Petition No. V-2004-5 (September 22, 2005) (*Midwest Generation - Waukegan*); *In re Consolidated Edison Co. Hudson Ave. Gen. Station*, Petition No. II-2002-10 (September 20, 2003).

The Petitioner claims further that the Sierra Club comments showed that, if the pre-project baseline emissions were calculated for the 24 months immediately preceding the economizer/superheater replacement project, as the Petitioner asserts the Wisconsin SIP presumes, the number of regained hours of operation from the project would be 167.50 rather

---

[4] EPA believes the proper cite to the PSCW application should be to page 12.

than 30.075 hours. Petition at 17, citing Sierra Club comments at 17-18; Wis. Admin. Code NR 405.02(1)(a) (2004). The Petitioner alleges that WDNR, again, refused to reconsider its "prior off-permit non-applicability determination." Petition at 17. The Petitioner claims that this response, which "was effectively a refusal to consider the comment," is insufficient and that the Administrator must object. *Id.*

The Petitioner alleges that a title V permit "must assure[] compliance by the source with all applicable requirements." Petition at 17, quoting section 504(a) of the CAA. (Some cites omitted.) The Petitioner further asserts that "applicable requirements" include "requirements contained in preconstruction permits and the requirement to obtain preconstruction permits, comply with BACT, and undertake air impact analysis." Petition at 17, citing 40 C.F.R. § 70.2; Wis. Stat. § 285.64(1); Wis. Admin. Code § NR 400.02(26). The Petitioner asserts that PSD requirements are applicable requirements for Columbia Unit 1, and WDNR's failure to assure compliance with PSD was based on erroneous data. Petitioner further claims that WDNR's analysis assumed an erroneous heat input for Unit 1, as well as underestimating the regained hours of operation attributable to the economizer/superheater replacement project. Petition at 17-18. The Petitioner claims that the permit's failure to assure compliance with PSD requirements results in unreviewed emission increases and a failure to ensure BACT emission limits are met, and concludes that the Administrator must object. Petition at 18.

### Response

EPA finds that WDNR failed to adequately respond to significant comments concerning whether PSD was triggered by the 2006 physical change. The failure of WDNR to respond to comments may have resulted in a flaw in the permit regarding PSD requirements.

In its reevaluation, WDNR must consider and address Petitioner's assertions regarding underestimated emissions increases attributable to the project. For example, WDNR should address and resolve Petitioner's assertion of an apparent conflict related to calculations of the hourly heat input and the estimate of regained hours of operation due to the physical change.

## II.   Compliance Schedule

The Petitioner asserts that every title V permit "must disclose all applicable requirements and any violations at the facility." Petition at 18, citing section 503(b) of the CAA; 40 C.F.R. § 70.5(c)(4)(i), (5), (8); Wis. Admin. Code § NR 407.05(4)(h). The Petitioner further claims that, for applicable requirements for which the source is not in compliance at the time of permit issuance, the source's application must provide a narrative description of how the source intends to come into compliance with the requirements. Petition at 18, citing section 503(b) of the CAA; 40 C.F.R. § 70.5(c)(8)-(9); Wis. Admin. Code § NR 407.05(4)(h)2.c.; Midwest Generation - Waukegan at 4. The Petitioner states that the application must propose a compliance schedule for any applicable requirement with which the source is not in compliance. Petition at 18, citing 40 C.F.R. § 70.5(c)(8)(iii); Wis. Admin. Code § NR 407.05(4)(h)2.c. The Petitioner further claims that, if any statement in the application was incorrect, or if the application omits relevant facts, including the fact that a facility is not in compliance, the applicant has an ongoing duty to supplement and correct the application. Petition at 18, citing 40 C.F.R. § 70.5(b); Wis. Admin.

Code § NR 407.05(9). The Petitioner states that the final title V permit must contain a compliance schedule for any requirements with which the facility is not in compliance at the time of permit issuance. Petition at 18, citing section 504(a) of the CAA; 40 C.F.R. § 70.6(a), (c).

The Petitioner quotes at length from its comments on the draft permit, in which it set out data from the "most recent" excess emission reports which, Petitioner alleges, confirm that Columbia has "unaddressed, continuing opacity violations" from 2007 and 2008. Petition at 18-19. The Petitioner claims that it had attached to its comments the excess emissions reports, "signed by the company attesting to the accuracy, showing these ongoing violations." Petition at 19, citing to Columbia's excess emission report for opacity. The Petitioner alleges that WDNR agreed that there were violations at Columbia, but that it refused to impose a compliance schedule because it believed that "the duration of the exceedance is not significant enough to warrant a compliance plant [sic] in the current permit renewal," based upon a guidance document from EPA regarding enforcement actions for high priority violations. Petition at 19-20, quoting WDNR Response to Comments at 2-3. The Petitioner claims that this was not a case in which WDNR determined that the excess emission reports were insufficient to demonstrate non-compliance, or where the Petitioner is asking the State or EPA to made a finding of violation where the "violations are contested by both the permitting authority and the source." Petition at 20 (cites omitted). Rather, Petitioner asserts, WDNR determined that there were violations at Columbia but nevertheless relied upon EPA guidance, *The Timely and Appropriate (T&A) Enforcement Response to High Priority Violations (HPVs)* Figure 4-4 (OECA June 23, 1995) (HPV Guidance), to determine that, despite the violations, no compliance schedule was required. Petition at 20. The Petitioner claims that the result of WDNR's interpretation is "to confine the requirement of a compliance schedule in 42 U.S.C. § 7661c(a) and 40 C.F.R. § 70.5(c)(8)(iii) to High Priority violations under EPA Guidance." Petition at 20. The Petitioner states that WDNR "suggests that only violations meeting the definition of a High Priority violation or HPV under EPA Guidance" require a compliance schedule in the Part 70 permit. Petition at 20, citing WDNR Response to Comments at 2. Petitioner asserts that WDNR misinterprets the law; neither title V nor Part 70 conditions the requirement of a compliance schedule on a "significance" threshold. Petition at 20. The Petitioner claims that, based on the plain language of section 504(a) of the CAA, as well as 40 C.F.R. § 70.6(a)(1), "a schedule of compliance is required in each permit." Petition at 21. The Petitioner concludes that, since WDNR agrees that Columbia is not complying with opacity limits at all times, a compliance schedule is mandatory, and WDNR's failure to include one in the permit requires that the Administrator object. Petition at 22.

The Petitioner asserts that the Administrator has objected previously, based on a petition that raised a similar issue. The Petitioner states that Sierra Club had petitioned the Administrator to object to a title V permit, issued to the TVA Gallatin Power Plant, which allowed the facility to rely on emission reports to certifying compliance with opacity limits, despite the fact that the emission reports showed violations of the opacity standard up to 2% of operating time. According to the Petitioner, in that case, a state regulation exempted facilities violating the opacity limit less than 2% of the time from immediate enforcement actions, and, based on that regulation, the title V permit allowed reports showing violations up to 2% of the time to be "prima facie evidence of compliance." Petition at 22, citing *In re TVA Gallatin Power Plant*,

Petition No. IV-2003-4 (July 29, 2004) (*TVA Gallatin*) at 4-8. The Petitioner claims that EPA objected to the permit because the exception for up to 2% of operating time contradicted the applicable standard in the SIP. *Id.* The Petitioner concludes that, although EPA's objection in the *TVA Gallatin* petition was based on 40 C.F.R. § 70.6(c)(1), the holding applies here: exemptions from opacity limits based on enforcement policies that are not included in the approved SIP are not a lawful basis for omitting applicable Part 70 requirements. *Id.*

The Petitioner further claims that the HPV criteria to which WDNR cited were not intended for title V permitting, and asserts that violations that do not constitute HPVs are not considered compliance with the law. *Id.* The Petitioner states that the HPV Guidance is intended to "'prioritize violations for enforcement purposes,' and not to redefine what constitutes a violation." Petition at 22-23, quoting HPV Guidance at 1-1. The Petitioner claims that the HPV Guidance emphasizes that it should not be read as excusing violations. Petition at 23, citing HPV Guidance at 1-1. The Petitioner states that the HPV Guidance directs that it "cannot be used to establish new standards or limits, are not binding on any party, and cannot be relied upon to create any rights enforceable by any party." Petition at 23, quoting HPV Guidance at A-1. The Petitioner concludes that the HPV Guidance does not define a violation, but prioritizes which violations will receive the most attention when spending limited civil and criminal enforcement resources. Petition at 23. The Petitioner asserts that WDNR should be "well aware" that the guidance does not re-write the regulations that establish standards. The Petitioner quotes extensively from a September 6, 2005 letter, in which the Wisconsin Attorney General stated "there is no 'minor violations' exception in the law, and that violations of the law, no matter how seemingly 'minor' in effect, do and should have enforcement consequences commensurate with those violations." Petition at 23-24, quoting September 6, 2005 Wisconsin Attorney General letter. The Petitioner claims that WDNR's "decision to sanction excess opacity emissions" conflicts with the CAA, Part 70, and EPA's prior decisions, as well as the State Attorney General's interpretation of the law and guidance. The Petitioner concludes the Administrator must object to the Columbia title V permit and require WDNR to reissue the permit with a compliance schedule that brings the plant into compliance with visible emission limits, consistent with 40 C.F.R. § 70.5(c)(8).

**Response**

EPA's regulations require a compliance schedule for "sources that are not in compliance with all applicable requirements at the time of permit issuance." 40 C.F.R. § 70.5(c)(8)(iii)(C); see also 40 C.F.R. § 70.6(c)(3). EPA finds that Petitioner has not demonstrated noncompliance at the time of permit issuance necessitating a compliance schedule. Although Petitioner submitted opacity reports showing emissions in excess of the opacity standard, Petitioner's reference to these reports does not demonstrate that the source's exceedances of the opacity standard were violations, or that the source was in non-compliance at the time of permit issuance necessitating a compliance schedule. EPA notes that not all exceedances necessarily constitute violations of the opacity standards. The Wisconsin SIP contains certain exceptions from the opacity standard. See NR 431.05. Further, WDNR reviewed these emission reports and determined the exceedances were "not significant enough to warrant a compliance plan in the current permit renewal." Response to comments at 2.

Contrary to Petitioner's assertion, it is not clear from WDNR's response to comment that the State actually found that the source was in violation of opacity requirements at the time of permit issuance. The Petitioner makes much of the fact that the State determined that the exceedances would not trigger the high priority enforcement policy. EPA does not believe that the State's discussion of the high priority enforcement policy constituted a finding that the source was in violation of opacity requirements at the time of permit issuance. EPA notes that if a permitting authority determines that a source is in violation of a requirement at the time of permit issuance, it would not be appropriate for the permitting authority to simply refer to an enforcement policy to determine that no compliance schedule is necessary. But here the State did not expressly find violations at the of permit issuance necessitating a compliance schedule. See *Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670 (7th Cir. 2008) (upholding EPA's decisions denying petitions to object to several title V permits issued by the Illinois Environmental Protection Agency to Midwest Generation, and finding that, in light of the strict time lines for title V permit processing and review, the complementary enforcement authorities under the Act, the fact that the sources had certified compliance, and the State's review of the data, it was reasonable for EPA to determine that petitioners had not made the requisite demonstration under CAA section 505(b)(2) that the permit was not in compliance with the Act).

The Petitioner also argues that:

The Administrator has objected previously based on a petition raising a similar issue. *In re TVA Gallatin Power Plant*, Petition IV-2003-4, Order at 4- 8 (EPA Adm'r July 29,2004). In the *TVA Gallatin* case, Sierra Club petitioned the Administrator to object to a Title V permit that allowed a facility to rely on emission reports to certify compliance with opacity limits despite the fact that the emission reports showed violations of the opacity standard up to 2% of operating time. *Id.* A state regulation exempted facilities violating the opacity limit less than 2% of the time from immediate enforcement actions and, based on this regulation, the title V permit allowed reports showing violations up to 2% of the time to be "prima facia evidence of compliance." *Id.* However, because the exception for up to 2% of operating time contradicted the applicable standard in the state implementation plan, EPA objected. *Id.* Although EPA's objection in the *TVA Gallatin* case was based on 40 C.F.R. § 70.6(c)(1), the holding is equally applicable here-exemptions from opacity limits based on enforcement policies that are not included in the approved implementation plan are not a lawful basis for omitting applicable Part 70 requirements.

Petition at 22. Plainly, the *TVA Gallatin* matter has little relevance here. For example, unlike *TVA Gallatin*, the current petition does not involve an allegation that the permit terms contradict the applicable requirements regarding opacity. In the present matter, the title V renewal permit does not improperly excuse or exempt opacity exceedances up to 2% of the time or allow such to be "prima facia evidence of compliance." *Id.*

For the reasons noted above, I deny the Petition on this issue.

## III.   Part 2 Application for Case-by-Case MACT for Industrial Boilers

The Petitioner claims that Columbia is a major source of hazardous air pollutants under section 112 of the Act, and that it contains an industrial boiler covered by 40 C.F.R. Part 63, subpart B, Table 1. Petition at 25, citing to Sierra Club comments at 27-28. The Petitioner contends that, because the Circuit Court of Appeals for the District of Columbia (D.C. Circuit) vacated the MACT for industrial boilers in *Natl. Res. Def. Council v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007), industrial boilers are subject to the "MACT Hammer" provision of 42 U.S.C. § 7412(j). Petition at 25-26. Thus, the Petitioner reasons, the requirement to apply for a limit under section 112(j), Part 2 of the CAA applies to Columbia. Petition at 26, citing 40 C.F.R. § 63.52(e). The Petitioner states that it requested in its comments on the draft permit that WDNR "acknowledge that 112(j) and 40 C.F.R. §§ 63.50 - 63.56 are applicable requirements, and include a schedule of compliance requiring a MACT Part 2 application immediately, and a revised title V permit within 18 months to incorporate a case-by-case limit." Petition at 26, citing Sierra Club comments at 31-32 (additional cites omitted). The Petitioner claims that WDNR refused, saying that '[a]t this time there are no specific enforceable requirements that we can include in the operation permit, such as when an application under s. 112(j) needs to be submitted." Petition at 26, quoting WDNR Response to Comments at 3. The Petitioner asserts that WDNR is incorrect, that the requirement to apply for a limit under section 112(j) of the CAA applies to Columbia, and that WDNR must include it in the Columbia permit. Petition at 26.

The Petitioner asserts that the case-by-case MACT limit and the requirements to submit a Part 2 application and obtain a case-by-case MACT limit are applicable requirements, and that the Administrator must object because WDNR did not include either these applicable requirements or a schedule of compliance in the Columbia permit. Petition at 27. The Petitioner discusses at length why these requirements are "applicable requirements" under 40 C.F.R. § 70.2. *Id.*

The Petitioner claims that 40 C.F.R. § 63.52(e)(1) is an applicable requirement which provides that "[e]ach owner or operator who is required to submit to the permitting authority a Part 1 MACT application ... must also submit to the permitting authority a timely Part 2 MACT application for the same sources which meets the requirements of Sec. 63.53(b) ... *no later than the applicable date specified in Table 1 to the subpart* (emphasis added)." Petition at 27, quoting 40 C.F.R. § 63.52(e)(1). The Petitioner notes that WPL has submitted a Part 1 application for the Columbia facility. Petition at 27. The Petitioner states that, in its comments on the draft permit, the Sierra Club requested that WDNR acknowledge that 112(j) and 40 C.F.R. §§ 63.50-63.56 are applicable requirements, include a schedule of compliance requiring a MACT Part 2 application immediately, and revise the Columbia title V permit within 18 months to incorporate a case-by-case limit. The Petitioner asserts that, according to table 1 under 40 C.F.R. § 63.53(b), the deadline to submit a Part 2 application was April 28, 2004. *Id.* The Petitioner concludes that the Administrator must object because case-by-case MACT limits and the requirement to submit a Part 2 application are applicable requirements that WDNR did not include in the permit. Petition at 27-28. The Petitioner further states that Part 70 requires that each permit contain a compliance schedule consistent with 40 C.F.R. § 70.5(c)(8). Petition at 28, citing 40 C.F.R. §§ 70.5(c)(8), 70.6(c)(3). The Petitioner asserts that the Administrator must also object because the Columbia

16

permit does not contain a schedule of compliance to bring the facility into compliance with both the obligation to submit a Part 2 application and the future obligation to comply with a case-by-case section 112(j) limit that will become effective during the five-year permit term. Petition at 28.

### Response

In its July 9, 2008, Response to Comments, WDNR stated:

Boilers and process heaters at major sources of hazardous air pollutants were subject to regulation under 40 CFR 63 Subpart DDDDD, which was vacated by the D.C. Circuit Court of Appeals (6/8/2007). The Department promulgated a standard at ch. NR 462, Wis. Adm. Code, which is equivalent to the vacated boiler MACT at 40 CFR 63 Subpart DDDDD. The state rule was stayed by emergency order AM-38-07E and order AM-37-07. The absence of the EPA standard may trigger the requirements of s. 112(j)(5) of the Clean Air Act which generally requires affected facilities to submit a permit application for a case-by-case MACT determination under 40 CFR 63.52. The Department is waiting for specific guidance from EPA on what must be done when a promulgated standard is vacated by the courts. At this time there are no specific enforceable requirements that we can include in the operation permit, such as when an application under s. 112(j) needs to be submitted. Once a complete application has been received, the Department may revise the permit under s. NR 407.14, Wis. Adm. Code, to make the case-by-case MACT determination. A footnote was added to the final permit addressing the applicability of s. 112(j).

WDNR Response to Comments at 3.

WDNR added a footnote to the final permit for Columbia regarding 112(j) which states:

The Department may revise this section under s. NR 407.14, Wis. Adm. Code, to address additional requirements for hazardous air pollutant emissions as required under section 112(j) of the Clean Air Act [42 U.S.C. 7412(j)]. Under s. 112(j)(2), an affected facility is required to submit a permit application if EPA fails to promulgate a standard for a source category (industrial boiler).

Columbia permit at 5.

Subsequent to responding to the Petitioner's comments on Columbia permit P20 on July 9, 2008, WDNR requested a 112(j) application from Columbia. On November 11, 2008, WDNR notified potentially subject sources, including Columbia, via email, of their 112(j) obligations. In the message, WDNR stated, "[o]ne interpretation is that an application is due no later than 18 months after the court vacatur of the EPA standard for boilers and process heaters (i.e. due 1/27/2009)." WDNR received Columbia's 112(j) Part 1 application on January 26, 2009, and its Part 2 application 60 days later, on March 26, 2009.

The Petitioner claims that Part 70 requires that each permit contain a compliance

17

schedule consistent with 40 C.F.R. § 70.5(c)(8). The Petitioner asserts that the Administrator must object because the Columbia permit does not contain a schedule of compliance to bring the facility into compliance with both the obligation to submit a Part 2 application and the obligation to comply with a case-by-case section 112(j) limit that will become effective in the future. Even assuming that Petitioner's view of Columbia's obligation to submit a Part 2 application is correct, because Columbia has already submitted its Part 2 application, Petitioner's claim with respect to this issue is moot. With respect to Petitioner's claim that the permit's schedule of compliance must address the future obligation to comply with a case-by-case section 112(j) limit, EPA notes that WDNR would incorporate a 112(j) limit through a title V permit amendment and it is possible that compliance with any such limit will not be required until after the current permit term. Thus EPA denies the claim that the title V permit that is the subject of this petition was required to address the 112(j) limit.

     For the reasons discussed above, I deny the petition on this issue.

## CONCLUSION

     For the reasons set forth above, and pursuant to section 505(b)(2) of the Clean Air Act, I am granting in part and denying in part the petition filed by David Bender on behalf of the Sierra Club. Because this permit has been issued, EPA or the permitting authority will modify, terminate, or revoke and reissue the permit consistent with the procedures in 40 C.F.R. §§ 70.7(g)(4) or (5)(i) and (ii), and 70.8(d). WDNR shall have 90 days from receipt of this Order to resolve the objections identified above and to terminate, modify, or revoke and reissue the Columbia title V renewal permit accordingly.

Dated: _10/8/09_

                                  Lisa P. Jackson
                                  Administrator